```
                              *

JERALINE TAYLOR,              *

     Plaintiff,               *

         v.                   *    CIVIL NO.: WDQ-12-2858

RITE AID CORPORATION,         *
     et al.
                              *

     Defendants.
  *    *    *    *    *    *    *    *    *    *    *    *    *
```

## MEMORANDUM OPINION

Jeraline Taylor sued Rite Aid Corporation (the

"Corporation") and Rite Aid of Maryland, Inc. ("Rite Aid"),

(together the "defendants"), for employment discrimination in

violation of Title VII of the Civil Rights Act of 1964 ("Title

VII"),[1] the Americans with Disabilities Act of 1990, as amended

("ADA"),[2] and the Family Medical Leave Act of 1993 ("FMLA").[3]

ECF No. 1. Pending is the defendants' motion for summary

judgment. ECF No. 15. No hearing is necessary. Local Rule

105.6 (D. Md. 2011). For the following reasons, the defendants'

motion will be granted in part and denied in part.

---

[1] 42 U.S.C. §§ 2000e et seq.

[2] 42 U.S.C.A. § 12101 et seq.

[3] 29 U.S.C. §§ 2601 et seq.

I. Background[4]

In 1998, Rite Aid hired Taylor, an African-American female over the age of 40, as an Order Fulfillment Associate. *See* ECF Nos. 15-1 at 3, 15-2 at 2-3, 18-10 at 12. For the duration of her employment with Rite Aid, Taylor worked at the Rite Aid Distribution Center in Perryman, Maryland. ECF No. 15-3. In 1999, she was promoted to assistant manager, and in 2003, she was assigned to the Replenishment Department. *See id.* "The Replenishment Department is responsible for [e]nsuring that product has been moved from storage to the proper location to be picked by pickers to fulfill store orders." *Id.*

Taylor has lupus,[5] a condition that causes symptoms of "tiredness." *See* ECF No. 18-2 at 11-12. Her condition did not force her to take extended absences from work, but some days she was too tired to come to work or would need to leave for several

---

[4] The facts are taken from the defendants' motion, ECF No. 15, Taylor's opposition, ECF No. 18, the defendants' reply, ECF No. 21, and their supporting exhibits. In reviewing a motion for summary judgment, the nonmovant's evidence "is to be believed, and all justifiable inferences are to be drawn in [her] favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

[5] "Lupus is an autoimmune inflammatory disease that often manifests itself in fatigue or skin rashes, but in severe cases may result in major organ failure. Conditions vary by patient, but lupus is generally characterized by intermittent 'flare-ups' of symptoms." *Sampson v. City of Cambridge, Md.*, CIV. WDQ-06-1819, 2008 WL 7514365, at *8 (D. Md. June 5, 2008) *aff'd sub nom. Sampson v. City of Cambridge, Maryland*, 322 F. App'x 295 (4th Cir. 2009) (internal citations omitted).

hours to go to doctor's appointments. *See id.* In 2000 or 2001, she was approved for intermittent FMLA leave by Rite Aid to accommodate her symptoms and need to visit the doctor. *See id.*

As an assistant manager, Taylor was responsible for supervising drivers and stockers (together "associates"), and leads (other supervisors), at the distribution center.[6] ECF No. 15-2 at 3, 6-7, 14. The associates had productivity goals which were tracked by a computer and reported on weekly. *Id.* at 6-7. One of Taylor's responsibilities was to monitor the associates' performance, and talk to them if they were not meeting their productivity goals. *Id.* at 7. This was referred to as a "counseling." *Id.* Taylor was required to complete counselings within a certain time--generally two weeks--from receiving the relevant data and record their completion on the computer. *See id.* at 9, 23.

From 2003 until April 2007, Karen Brown supervised Taylor. *See* ECF Nos. 15-5 at 5, 18 at 3. Brown conducted several formal performance reviews of Taylor. *See, e.g.*, ECF No. 15-2 at 74. The reviews generally rated employee performance from "Unsatisfactory" to "Outstanding" in 15 performance areas. *Id.*

---

[6] Drivers "pick the product [off] the shelves and then they take it to the stockers." ECF No. 15-2 at 3. The stockers then place the product in the appropriate location so that it can be picked and distributed to Rite Aid stores. *See id.* at 2-3; ECF No. 15-5 at 3.

3

at 27. In Taylor's April 2005 review, for example, Brown rated Taylor as "Very Good" in several performance areas, as "Meets Expectations" in several other performance areas, and as "Needs Improvement" in two areas. *Id.* at 74-77. Taylor received an overall rating of "Meets Expectations," which meant that Taylor's performance was considered "standard" and her results "as expected."[7] *Id.* at 77. In an addendum to the review, Brown set four concrete objectives for Taylor following the review, including: "Improve organizational skills" and "Start holding leads accountable for responsibilities[;] Issue counselings when needed." *Id.* at 78. Taylor's April 2006 review closely resembled her previous year's review, except she was only marked as "Needs Improvement" in one performance area. *See id.* at 79-82. She again received an overall rating of "Meets Expectations." *Id.* at 82.

On June 30, 2006, Taylor received a "corrective action" which took the form of a written counseling. *Id.* at 83. The incident was described as follows: "Jerri has had work performance that . . . does not meet the requirements for the position. She has failed to carry out her responsibility of

---

[7] In contrast to the individual performance areas, for which a supervisor could choose one of six performance ratings to give an employee, for the overall rating, the supervisor could only choose between "below," "meets," or "above" expectations. *See, e.g.,* ECF No. 15-2 at 82.

4

conducting productivity counseling by the due dates given." *Id.*
It noted that Taylor had not met her deadlines for March, April,
and May.[8] *Id.*

In August, September, and October of 2006, Taylor received
summaries of her performance generated from computer data
tracked by the company's "Performance Assessment Tool" ("PAT").
ECF No. 15-2 at 84-92. She received favorable assessments in a
few areas, but in several others, including "Productivity" and
"Attendance" counseling of associates, she received marks of
"Unsatisfactory," because she failed to counsel many of her
associates "within two weeks of data availability." *Id.* at 84.
On October 18, 2006, she received another corrective action
because of her unsatisfactory results on the PAT assessments.
*Id.* at 93. The corrective action noted that "[f]ailure to
consistently adhere to the timely issuance of reviews as well as
coaching, counseling and exception administration . . . fosters
an atmosphere of associate dissatisfaction . . . . Continuation
of this negligence will result in progressive disciplinary
action and/or termination." *Id.* Following this corrective

---

[8] Taylor testified that her lupus symptoms "probably would
influence why sometimes I would be behind on the counseling."
ECF No. 15-2 at 39. She did not mention this to anyone at Rite
Aid, however. *Id.*

action, Taylor continued to receive poor PAT assessments.[9] *Id.*
at 94-99.

On December 20, 2006, the day after Taylor took a day of
FMLA leave, Jen Lazor, a Human Resources ("HR") Manager, and
Brown met with Taylor to discuss their concerns about her
performance. ECF Nos. 18-2 at 18, 20, 18-7 at 2-3. They
discussed her difficulties in timely administering counselings
to her associates and suggested that these difficulties may have
been caused by her lupus and FMLA status. *See* ECF No. 18-2 at
30-31. They also felt that the stress of her job may be
exacerbating her symptoms. *See id.* at 22, 30-31. They offered
to find her another, less demanding, job. *See id.* at 22, 30-31.
Taylor refused their offer. *Id.* at 22.

In April 2007, Brown conducted another performance review
of Taylor. ECF No. 15-2 at 100-03. In the written portion of
the review, Brown wrote "Below Expectations[:] Jerri did not
succeed with the tracking and counseling of the associates[']
attendance and productivity . . . for majority of the year. . .
. . She needs to improve [time] management and multi-tasking
skills. Jerri did show improvement toward the latter part of
the year." *Id.* at 100. Taylor received ratings of "Needs

---

[9] Taylor's November 2006 PAT assessment stated that "Jerri will
be held accountable for the completion of her weekly
expectations. This accountability will be in the form of
corrective action up to and including termination." ECF No. 15-
2 at 96.

6

Improvement" in six performance areas and favorable reviews in the other areas. *Id.* at 101-03. However, Taylor's overall rating was still "Meets Expectations." *Id.* at 103.

Beginning in May 2007, Charles Williams replaced Brown as Taylor's supervisor for the remainder of Taylor's employment at Rite Aid. ECF No. 15-5 at 5. Although they got along well at first, Williams soon began to give Taylor instructions through her co-worker, Cipriano Valdez, a male assistant manager, rather than speak to Taylor directly. ECF No. 18-2 at 10. Also, Williams spoke to Taylor at least twice about her tardiness in completing counselings for associates. *See* ECF No. 15-5 at 9-11.

At some time,[10] Taylor met with Williams to discuss filling an open position for a driver trainer. ECF No. 18-2 at 12-13. Taylor recommended Laurie Lockett, whom she believed was the department's "top driver." *Id.*; ECF No. 18-6 at 24. According to Taylor, Williams refused to promote Lockett, because Lockett's FMLA status might affect her availability.[11] ECF No. 18-2 at 13. Instead, Williams told Taylor that he planned to

---

[10] Taylor was unsure when this interaction occurred. ECF No. 18-2 at 14-15.

[11] Williams denies that he told Taylor he did not want to promote Lockett because of her FMLA status but admits that: (1) he told Taylor that Lockett had attendance issues; and (2) he knew Lockett was approved for FMLA leave. ECF Nos. 15-5 at 16, 18-6 at 24.

7

choose another driver to fill the position, who had only worked in the department for six months. *See id.* According to Taylor, she asked Williams: "You have something against people who have FMLA?" *Id.* at 14. He replied: "Sometimes it can hinder us if people just take off any time." *Id.* Taylor then informed Williams that she also had an FMLA, and he responded "You do?"[12] *Id.* Taylor said "[y]es" and walked out of the room. *Id.*

On August 10, 2007, Taylor received a final performance review from Brown.[13] ECF No. 18-8. She was marked as "Needs Improvement" in two performance areas, was otherwise rated favorably, and received "Meets Expectations" overall. *Id.* In the written performance summary, Brown noted that "Jerri has been able to complete the required appraisals and counselings by given deadlines . . . . She has improved immensely since her fiscal yearly evaluation." ECF No. 18-8 at 2.

On August 30, 2007, Taylor met with Lazor and Daniel McDaniel, Operations Manager of HR. ECF No. 18-2 at 17-20. Taylor informed them that she felt uncomfortable working with Williams because of his attitude toward persons approved for

---

[12] Williams denies that he learned of Taylor's FMLA status during this conversation. ECF No. 15-5 at 16.

[13] Rite Aid does not explain why Brown, who had been transferred to a different department, *see* ECF No. 18-2 at 7, completed Taylor's review, instead of her new supervisor, Williams, *see* ECF No. 18-6 at 13-14.

8

FMLA leave, and because she felt that he was discriminating against her on the basis of her sex by giving her instructions through her male co-worker, Valdez.[14] *See id.* at 11, 19, 39-40. She requested a transfer to a different department. *See id.* at 18. McDaniel initially responded to Taylor by asking if she wished to transfer because Williams was the "first man [she] ever worked for;" Taylor told him that she had other male managers in the past. *Id.* at 19. Williams learned of this conversation before Taylor was terminated. *See* ECF No. 18-6 at 34-35.

Taylor did not take FMLA leave while Williams was her supervisor, because she was concerned about his attitude about FMLA.[15] *See* ECF No. 15-2 at 42. However, shortly before she was terminated, she informed Williams that she was taking FMLA leave for part of the day to attend a doctor's appointment. ECF Nos. 15-2 at 43, 73; 18-2 at 16.

On September 19, 2007, Taylor met with McDaniel and Williams in the HR department. *See* ECF No. 18-2 at 24-25. They

---

[14] Brown encouraged Taylor not to complain about Williams. ECF No. 18-2 at 38.

[15] Carla, one of Taylor's leads, came to Taylor requesting vacation time so she could take her parents to the doctor. ECF No. 18-2 at 15. Taylor asked her why she was taking vacation time when she had been approved for FMLA leave. *See id.* Carla told her that she "refuse[d] to use another FMLA paper while [Williams is] in this department." *Id.* at 15-16.

informed her that she was being terminated for job performance.
*See id.* at 25.

The parties dispute which employees were involved in the
decision to terminate Taylor.[16]   *See* ECF No. 15-1 at 8.   In their
interrogatory answers, the defendants assert that "upon
information and belief, Plaintiff's supervisor Charles Williams
and Human Resources Manager Dan McDaniel"[17] were "involved in the
decision making process to terminate Plaintiff's employment."
ECF No. 18-7 at 4.   However, Williams testified that he did not
decide to terminate Taylor and did not find out about her
termination until the day it occurred.   *See* ECF No. 18-6 at 25-
26.   Before her termination, Williams was asked to comment on
Taylor's performance by his supervisor Brent Hubbard.   ECF Nos.
15-5 at 6, 15-6, 18-6 at 7.   Williams told Hubbard that Taylor's
performance "reports reflected that she wasn't performing her
job duties as an Assistant Manager as far as just coaching and

---

[16] Rite Aid's evidence establishes that "HR and the Operations
Team" were responsible for decisions "to terminate any
management personnel."   *See* ECF No. 18-6 at 26.   Taylor asserts
that "Rite Aid has provided conflicting and inconsistent
evidence of the person[s] who were involved in the decision to
terminate Taylor."   ECF No. 18 at 10.

[17] Lazor testified that McDaniel, along with others, was
responsible for deciding when to terminate employees in Taylor's
position.   ECF No. 18-9 at 11.   She also stated that he was
responsible for actually telling Taylor she had been fired.   *See
id.* at 13.   However, Williams stated that Lazor had fired Taylor
and that he did not remember McDaniel being present.   *See* ECF
No. 18-6 at 32, 36.

10

counseling, as far as issuing documentation to associates in a proper and expedient manner." ECF No. 15-5 at 9. Williams believed though that Taylor was "qualified" for her job. ECF No. 18-6 at 22.

Lazor testified that she was not informed beforehand that Taylor was going to be terminated. ECF No. 18-9 at 6. However, she said that "typically" she would be told before an assistant manager in the Replenishment Department was terminated, and she had been surprised that she was not told in Taylor's case. *See id.* at 12, 15. She stated that she "believe[d]" Taylor was terminated because of her performance. *Id.* at 15.

Angela Mayweathers, another HR manager at Rite Aid, testified that she also was not informed of Taylor's termination before it occurred. ECF No. 18-10 at 3-4. She also said that she would normally be made aware of all corrective actions, and other performance problems,[18] for assistant managers, because she was responsible for instituting training and other measures to help improve their performance. *See id.* at 17-18. She stated that she could not "recall seeing any corrective actions" or "action plans" pertaining to Taylor. *Id.* at 19. In response to the question--"did anyone bring to your attention that Ms.

---

[18] The only performance problem that Mayweathers would not address was attendance issues; otherwise "all other corrective actions" would be brought to her attention. ECF No. 18-10 at 19.

11

Taylor had any performance issues or needed any additional training[?]--Mayweathers said that she "was never approached with that request." *Id.* at 16.

Mayweathers also said that McDaniel believed Rite Aid employees were abusing FMLA but did not mention Taylor specifically. *Id.* at 10-11. However, McDaniel once told Mayweathers that Taylor "was not a good Manager" and should have been fired long before but had not because "she's protected by so many protected classes, African-American, women over 40 years of age, and her illness." *Id.* at 12. McDaniel also "spoke negatively" about having to accommodate another employee who had epilepsy. *See id.* at 14.

Sometime after her termination,[19] Taylor filed a discrimination charge with the Equal Employment Opportunity Commission ("EEOC"), alleging "that she was discharged because of her race[,] sex[,] and age . . . in violation of" Title VII, the ADA, and the Age Discrimination in Employment Act of 1967 ("ADEA").[20]  ECF No. 1-1 at 2. On July 5, 2012, the EEOC issued a written determination concluding that "it's more likely than not that [Rite Aid] discriminated against [Taylor] and discharged her because of her disability and retaliated against

---

[19] The record does not reveal the date on which Taylor filed her discrimination charge. *See, e.g.*, ECF No. 1 at 6.

[20] 29 U.S.C. §§ 621 *et seq.*

her for engaging in protected activity in violation of the ADA."
*Id.* at 3. The EEOC did not make any findings on Taylor's other
claims. *See id.* The EEOC was not able to obtain a settlement
on Taylor's behalf, however, and, on June 25, 2012, issued her a
right to sue letter. *See* ECF No. 1-2 at 2.

On September 25, 2012, Taylor filed a complaint against the
defendants. ECF No. 1. She alleged that she was: (1)
discriminated against because of her disability, in violation of
the ADA (count one); (2) discriminated against on the basis of
age, in violation of the ADEA (count two);[21] (3) discriminated
against on the basis of sex, in violation of Title VII (count
three);[22] (4) retaliated against for engaging in EEO activity and
using FMLA benefits, in violation of Title VII and the FMLA
(counts four and five); and (5) wrongfully discharged, in
violation of Maryland law (count six).[23] *See id.* On November 1,
2012, the defendants answered the complaint. *See* ECF No. 7.

---

[21] In her opposition to the motion for summary judgment, Taylor
withdraws her ADEA claim for lack of evidence. *See* ECF No. 18
at 1 n.2.

[22] In her opposition to the motion for summary judgment, Taylor
withdraws this claim for lack of evidence. *See* ECF No. 18 at 1
n.2.

[23] Taylor seeks, *inter alia*, a judgment declaring that her
termination "for taking necessary and required medical leave
[violates] the public policy of" Maryland. *See* ECF No. 1 at 12.

13

On June 3, 2013, the defendants moved for summary judgment. ECF No. 15. On July 5, 2013, Taylor opposed this motion. ECF No. 18. On July 29, 2013, the defendants replied. ECF No. 21.

II. Analysis

A. Standard of Review

The Court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).[24] In considering the motion, the judge's function is "not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson,* 477 U.S. at 249. A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248.

The Court must "view the evidence in the light most favorable to . . . the nonmovant and draw all reasonable inferences in [her] favor," *Dennis v. Columbia Colleton Med. Ctr., Inc.,* 290 F.3d 639, 645 (4th Cir. 2002), but the Court must abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from

---

[24] Rule 56(a), which "carries forward the summary-judgment standard expressed in former subdivision (c)," changed "genuine 'issue' [to] genuine 'dispute,'" and restored the word "'shall' . . . to express the direction to grant summary judgment." Fed. R. Civ. P. 56 advisory committee's note.

14

proceeding to trial," *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (citation and internal quotation marks omitted).

B. Wrongful Discharge Claim

In her complaint, Taylor alleges that her termination "for taking necessary and required medical leave [violates] the public policy of the State of Maryland."[25]  ECF No. 1 at 12.  The defendants contend that Taylor's wrongful discharge claim "is barred due to the available remedies under the federal discrimination statutes."  ECF No. 15-1 at 20.  Taylor does not respond to this argument, but in a footnote "recognizes that if her federal claims are sustained, her claim for wrongful discharge is not viable, and that if her claims are not sustained, the court will most likely exercise pendent jurisdiction of her remaining state claim."  ECF No. 18 at 1 n.2.

---

[25] Maryland applies the rule of *lex loci delicti* to determine the law to apply in tort cases, such as wrongful discharge.  *See, e.g.*, *Philip Morris Inc. v. Angeletti*, 358 Md. 689, 750, 752 A.2d 200, 233 n.28 (2000); *Makovi v. Sherwin-Williams Co.*, 316 Md. 603, 608, 561 A.2d 179, 181 (1989) (noting that wrongful discharge is a tort claim).  Under that rule, the court applies the law of the state "where the injury—the last event required to constitute the tort-occurred."  *Lab. Corp. of America v. Hood,* 395 Md. 608, 615, 911 A.2d 841, 845 (2006).  All the events at issue in this suit allegedly took place at Taylor's place of work, which is in Maryland.  *See, e.g.*, ECF Nos. 15-3 at 1, 18 at 5-6.  Accordingly, Maryland law governs Nesbitt's wrongful discharge claim.

15

In Maryland, an at-will employee can raise a wrongful discharge claim only if her termination violated a "clear mandate of public policy." *Adler v. Am. Standard Corp.*, 432 A.3d 464, 473 (Md. 1981). To establish a claim for wrongful discharge, a plaintiff must show: "(1) that [s]he was discharged; (2) that the dismissal violated some clear mandate of public policy; and (3) that there is a nexus between the defendant and the decision to fire [her]." *Shapiro v. Massengill*, 105 Md. App. 743, 661 A.2d 202, 213 (Md.Ct.Spec.App. 1995). The plaintiff must demonstrate the public policy with "clarity, specificity, and authority." *Id.* A cause of action for wrongful discharge does not lie when the discharge was "motivated by employment discrimination prohibited by Title VII and [Maryland statutory law]." *Makovi*, 316 Md. at 626, 561 A.2d at 189; *Chappell v. S. Maryland Hosp., Inc.*, 320 Md. 483, 497, 578 A.2d 766, 774 (1990) (applying *Makovi* to retaliation claims).

Here, Taylor asserts that her termination violated Maryland public policy, but she has not provided any evidence or argument of that public policy or that it would support a claim for wrongful discharge. *See King v. Marriott Inter. Inc.*, 160 Md. App. 689, 704, 866 A.2d 895, 903 (2005) (plaintiff must "identify the source of the public policy with particularity"). In concluding that conduct that allegedly violated Title VII

could not support a wrongful discharge claim, *Makovi* noted that "the generally accepted reason for recognizing the tort [of wrongful discharge], that of vindicating an otherwise civilly unremedied public policy violation, does not apply." *See* 316 Md. at 626, 561 A.2d at 189. This reasoning also applies to Taylor's claim, which depends on conduct that also allegedly violates the FMLA, a federal discrimination statute. *See* ECF No. 1 at 10-12. Thus, the viability of Taylor's wrongful discharge claim does not depend on whether her other claims are "sustained," but instead on whether they are otherwise remedied by statutes prohibiting workplace discrimination, such as the FMLA.[26] The defendants will be granted summary judgment on this claim.

C. Claims against the Corporation

The defendants assert that the Corporation is entitled to summary judgment on Taylor's claims, because Taylor "was not employed by Defendant Rite Aid Corporation." ECF No. 15-1 at 10. Taylor "accept[s] the Defendants' representation that she

---

[26] *See Chappell*, 320 Md. at 497, 578 A.2d at 774 ("[A]s to [plaintiff's] argument that the statutory remedies available to him are inadequate to fairly compensate him for his injury, we said in *Makovi* that they are exclusive and that to allow full tort damages to be claimed in the name of vindicating the statutory public policy goals upsets the balance between right and remedy struck by the Legislature in establishing the very policy relied upon.") (internal quotations and citations omitted).

17

was employed by Rite Aid of Maryland, Inc." ECF No. 18 at 1 n.1.

Title VII, the ADA, and the FMLA prohibit discrimination by an employer against an employee.[27] For purposes of Title VII and the ADA, an employment relationship is determined under agency principles and the "economic realities" test.[28] *See Garrett v. Phillips Mills, Inc.*, 721 F.2d 979, 981-82 (4th Cir. 1983); *Evans v. Wilkinson*, 609 F. Supp. 2d 489, 493 (D. Md. 2009); *Miller v. Ingles*, CIV. 1:09CV200, 2009 WL 4325218, at *7 (W.D.N.C. Nov. 24, 2009). However, the critical factor in analyzing whether an employment relationship exists is the degree of control exercised by the employer over the individual alleging agency status. *Garrett*, 721 F.2d at 981; *Cilicek v. Inova Health Sys. Servs.*, 115 F.3d 256, 259 (4th Cir. 1997). Under the FMLA, employment relationships are defined more expansively--the statutory definition of an employer includes "any person acting directly or indirectly in the interest of an

---

[27] *See, e.g., Jones v. Sternheimer*, 387 F. App'x 366, 368 (4th Cir. 2010); *Wright v. Sw. Airlines*, 319 F. App'x 232, 233 (4th Cir. 2009) (*citing* 29 U.S.C. § 2615(a)(2)).

[28] This test defines "employees" as those who "as a matter of economic reality are dependent upon the business to which they render service," and examines factors such as the "permanency of the relation, the skill required, the investment in the facilities for work, and opportunities for profit or loss from the activities." *Garrett v. Phillips Mills, Inc.*, 721 F.2d 979, 981 (4th Cir. 1983) (*quoting Bartels v. Birmingham*, 332 U.S. 126, 130, 67 S. Ct. 1547, 1550, 91 L. Ed. 1947 (1947)).

18

employer in relation to an employee." *See Kronk v. Carroll Cnty., MD*, CIV. L-11-0277, 2012 WL 245059, at *4 n.4 (D. Md. Jan. 25, 2012) (*quoting* 29 U.S.C. § 203) (internal quotations omitted).

Taylor has offered no evidence that she had an employment relationship with the Corporation under the ADA, Title VII, or the FMLA and "accepts" the defendants' representation that the Corporation did not employ her. *See* ECF No. 18 at 1 n.1. Accordingly, the Corporation is entitled to summary judgment on Taylor's ADA, FMLA, and Title VII claims. *See, e.g., Glunt v. GES Exposition Servs., Inc.*, 123 F. Supp. 2d 847, 875 (D. Md. 2000) ("In the absence of any evidence that [Defendant] is the 'employer' of Plaintiff, this Court does not have subject matter jurisdiction over Plaintiff's Title VII and FMLA claims.").

D. ADA Wrongful Discharge

Taylor asserts that Rite Aid terminated her employment "due to her disability, lupus." ECF No. 18 at 14. The ADA provides that "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).

To bring a wrongful termination claim under the ADA, Taylor must "first establish that [s]he is a 'qualified individual with a disability' under the ADA."[29] *Shin v. Univ. of Maryland Med. Sys. Corp.*, 369 F. App'x 472, 479 (4th Cir. 2010) (*citing Rohan v. Networks Presentations LLC*, 375 F.3d 266, 272 (4th Cir. 2004)). The ADA defines a disability as: "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment;[30] or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(1). Major life activities include, *inter alia*, "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." § 12102(2)(A).

---

[29] To establish a *prima facie* case of wrongful discharge under the ADA, a plaintiff must demonstrate that: "(1) [s]he is within the ADA'S protected class; (2) [s]he was discharged; (3) at the time of [her] discharge, [s]he was performing the job at a level that met [her] employer's legitimate expectations; and (4) [her] discharge occurred under circumstances that raise a reasonable inference of unlawful discrimination." *Haulbrook v. Michelin N. Am.*, 252 F.3d 696, 702 (4th Cir. 2001). To be within the ADA's "protected class," one must be "a qualified individual" with a disability. § 12112(a). Because the Court concludes that Taylor has not offered evidence that she has a disability under the ADA, she cannot establish a *prima facie* case of wrongful discharge.

[30] Taylor does not contend that she is disabled under the ADA, because there is a record of her impairment.

Taylor asserts that, "even if the evidence is insufficient to show [she] had a disability recognized by the ADA," Rite Aid regarded her as disabled because she was perceived as being limited in the major life activity of working. *See* ECF No. 18 at 14. The defendants contend that Taylor was not disabled, because "[s]he made no assertion that she could not engage in major life activities or was generally foreclosed from performing her job[] due to her lupus." ECF No. 15-1 at 14. They also argue that Taylor has not shown that Rite Aid "perceived her as being disabled within the meaning of the ADA." ECF No. 21 at 8-9.

### 1. Actually Disabled

"[T]o be substantially limited in the major life activity of working, 'one must be precluded from more than one type of job, a specialized job, or a particular job of choice.'" *Pollard v. High's of Baltimore, Inc.*, 281 F.3d 462, 471 (4th Cir. 2002) (*quoting Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 491-92, 119 S. Ct. 2139, 2151, 144 L. Ed. 2d 450 (1999)). A plaintiff must show she cannot work "in a broad range of jobs." *Id.*

Taylor has not offered evidence or argued that she is precluded from working in any job, including the one from which she was terminated. Instead, she rejected Lazor's and Brown's offer to reassign her to a different job that they believed would be less strenuous for her and insisted on staying in the

21

assistant manager position. *See* ECF No. 15-2 at 47-49.
Although Taylor's lupus negatively affected her job performance
at times, *see, e.g.*, ECF No. 18-2 at 12, this is insufficient to
show substantial limitation.[31] *See Papproth v. E.I. DuPont de
Nemours & Co.*, 359 F. Supp. 2d 525, 529 (W.D. Va. 2005) ("A
condition that simply affects or compromises an individual's
ability to perform major life activities is insufficient to
establish a disability.") (*citing Toyota Motor Manufacturing v.
Williams,* 534 U.S. 184, 197, 122 S. Ct. 681, 151 L.Ed.2d 615
(2002)). Thus, Taylor has not offered evidence that she is
disabled under the ADA.

2. Regarded as Disabled

A person is regarded as disabled if: "(1) a covered entity
mistakenly believes that a person has a physical impairment that
substantially limits one or more major life activities, or (2) a
covered entity mistakenly believes that an actual, nonlimiting
impairment substantially limits one or more major life
activities." *Sutton*, 527 U.S. at 489, 119 S. Ct. at 144; *Young
v. United Parcel Serv., Inc.*, 707 F.3d 437, 443 (4th Cir. 2013).

---

[31] The EEOC report finding evidence to support Taylor's claims of
disability discrimination asserts that Taylor is disabled
because of her lupus. *See* ECF No. 18-1. However, this report
does not demonstrate how lupus substantially limited Taylor in
any major life activity, and thus does not support Taylor's
claim. *Cf. Sampson*, 2008 WL 7514365, at *8 (finding that
plaintiff with lupus had not shown she was substantially limited
in any major life activity and thus was not disabled).

22

"To support a claim that an employee is 'regarded as'
substantially limited in the major life activity of working, the
employee must show that the employer viewed [her] as
'significantly restricted in the ability to perform either a
class of jobs or a broad range of jobs in various classes as
compared to the average person having comparable training,
skills and abilities.'" *E.E.O.C. v. Rite Aid Corp.*, 750 F.
Supp. 2d 564, 570 (D. Md. 2010) (*quoting* 29 C.F.R.
§ 1630.2(j)(3)(i)). Establishing that Rite Aid believed that
Taylor was unable to perform certain aspects of a particular job
is insufficient. *See Rohan,* 375 F.3d at 278.

To support her claim that Rite Aid regarded her as
disabled, Taylor cites employee observations of her having
"difficulty walking and climbing stairs," and Rite Aid's
awareness: (1) of her lupus and FMLA status; (2) that she was
absent because of her lupus more frequently than other assistant
managers; and (3) that lupus, and her "taking of FMLA leave,
were causing issues with the time frames in which she completed
her tasks." *See* ECF No. 18 at 14. The only evidence of
employee observations that Taylor had some physical difficulties
at her job was Williams's statement at his deposition that he
had observed Taylor have difficulties "just walking" while she
was "climbing stairs." ECF No. 18-6 at 37. However, he was
asked if Taylor had these difficulties "in general" or "in

23

performing her work," and he responded that they were "in general." *Id.* Thus, this statement does not support the conclusion that Williams regarded Taylor's walking difficulties as substantially limiting her in working.

Also, Rite Aid's "awareness" that Taylor had lupus and took intermittent FMLA leave, and that those conditions affected some aspects of her work, is insufficient to show Taylor was regarded as disabled. *See Rohan,* 375 F.3d at 278; *Haulbrook*, 252 F.3d at 703 ("The fact that an employer is aware of an employee's impairment, without more, is 'insufficient to demonstrate either that the employer regarded the employee as disabled or that perception caused the adverse employment action.'") (*quoting Kelly v. Drexel Univ.*, 94 F.3d 102, 109 (3d Cir. 1996)).

Further, by offering to place Taylor in a less strenuous position, *see* ECF No. 15-2 at 47-49, Rite Aid "specifically demonstrated its perception that Plaintiff could continue to work" and thus did not regard Taylor as disabled. *See Green v. CSX Hotels, Inc.*, 650 F. Supp. 2d 512, 519-20 (S.D.W. Va. 2009) (*quoting Graham v. Interstate Brands Corp.*, 00 C 4989, 2002 WL 1632283, at *8 (N.D. Ill. July 23, 2002) (internal quotations omitted)); *see also* ECF No. 18-6 at 22 (Williams states that he believed Taylor was "qualified" for her job). Accordingly, Taylor cannot establish that Rite Aid regarded her as disabled

under the ADA. Rite Aid will be granted summary judgment on Taylor's ADA wrongful discharge claim.

E. Retaliation

Title VII and the FMLA prohibit employers from discriminating against their employees because: (1) the employee has opposed illegal employment practices; or (2) the employee has made a charge, testified, assisted, or participated in an investigation. *See* 42 U.S.C. § 2000e-3(a); 29 U.S.C. § 2615; *Johnson v. Portfolio Recovery Associates, LLC*, 682 F. Supp. 2d 560, 569 (E.D. Va. 2009); *Yashenko v. Harrah's NC Casino Co., LLC*, 446 F.3d 541, 546 (4th Cir. 2006).

To survive an employer's motion for summary judgment, a plaintiff must show direct evidence of discrimination, or establish a *prima facie* case that raises an inference of illegal conduct.[32] The burden-shifting approach of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S. Ct. 1817, 36 L.Ed.2d 668 (1973) applies to retaliation claims.[33] First, the plaintiff must establish a *prima facie* case of retaliation. *See Laber v. Harvey,* 438 F.3d 404, 432 (4th Cir. 2006); *Wright*, 319 F. App'x

---

[32] *Coleman v. Md. Court of Appeals,* 626 F.3d 187, 190 (4th Cir. 2010); *Diamond v. Colonial Life & Accident Ins. Co.,* 416 F.3d 310, 318 (4th Cir. 2005); *Jordan v. Radiology Imaging Associates,* 577 F. Supp. 2d 771, 786 (D. Md. 2008).

[33] *Smith v. First Union Nat'l Bank,* 202 F.3d 234, 248 (4th Cir. 2000); *Yashenko*, 446 F.3d at 551.

at 233.  The burden then shifts to the employer to produce a legitimate, non-discriminatory reason for the adverse action. *See Laber*, 438 F.3d at 432.  The plaintiff must then demonstrate that the employer's reason was mere pretext for retaliation by showing "both that the reason was false *and* that discrimination was the real reason for the challenged conduct." *Jiminez v. Mary Wash. Coll.*, 57 F.3d 369, 378 (4th Cir. 1995) (internal quotation marks omitted).

To establish a *prima facie* retaliation claim under Title VII or the FMLA, the plaintiff must show: (1) protected activity; (2) "materially" adverse employment action;[34] and (3) a causal connection between the protected activity and materially adverse action. *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68, 126 S. Ct. 2405, 165 L.Ed.2d 345 (2006); *Bryant v. Aiken Reg'l Med. Ctrs. Inc.*, 333 F.3d 536, 543 (4th Cir. 2003); *Yashenko*, 446 F.3d at 551.  If the employer takes the action "shortly after" learning about the protected activity, courts may infer a causal connection between the two.  *Price v. Thompson,* 380 F.3d 209, 213 (4th Cir. 2004).  However, a plaintiff "must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer,"

---

[34] Termination of employment is a materially adverse employment action.  *See, e.g.*, *Gibson v. Marjack Co., Inc.*, 718 F. Supp. 2d 649, 655 (D. Md. 2010).  Thus, Taylor has satisfied this element.  *See, e.g.*, ECF No. 18-9 at 12-15.

not just a "motivating factor" to establish the causation element of a retaliation claim. *University of Texas Southwest Medical Center v. Nassar*, 133 S. Ct. 2517, 2533-34, 186 L. Ed. 2d 503 (2013).

### 1. Protected Activity

Under Title VII, an employee engages in protected activity if she opposes an "unlawful employment practice" that is prohibited by Title VII. *See* § 2000e-2(a)(1), -3(a). Title VII prohibits, *inter alia*, workplace discrimination on the basis of sex. *See* § 2000e-2(a)(1). Here, Taylor has offered evidence that she engaged in Title VII protected activity by complaining to Lazor and McDaniel that she believed Williams was discriminating against her on the basis of her sex by giving her instructions through Valdez, her male co-worker.[35] *See, e.g.*, ECF No. 18-2 at 39-40.

Under the FMLA, an employee engages in protected activity if she "oppose[s] any practice made unlawful by" the FMLA. § 2615; *Walker v. Gambrell*, 647 F. Supp. 2d 529, 540 (D. Md.

---

[35] Although Taylor concedes that she cannot produce evidence that Williams actually discriminated against her on the basis of sex, *see* ECF No. 18 at 1 n.2, Taylor only needs to demonstrate that she opposed practices that she objectively and reasonably believed violated Title VII to establish protected activity, *see Jordan v. Alternative Res. Corp.*, 458 F.3d 332, 342-43 (4th Cir. 2006). The defendants do not dispute that Taylor has produced sufficient evidence that she engaged in protected activity under Title VII to survive summary judgment. *See, e.g.*, ECF No. 15-1 at 17.

27

2009) ("[T]he FMLA only protects an employee from retaliation
for an activity protected under the FMLA itself."). Here,
Taylor has offered evidence that she engaged in FMLA protected
activity by complaining to Lazor and McDaniel that Williams
discriminated against her and others who took FMLA leave. *See*
ECF No. 18-2 at 13-14, 36.

Also, Taylor offered evidence that she took FMLA leave,
*see, e.g.*, ECF No. 15-2 at 43, 73, which is protected activity
under the FMLA, *see Yashenko*, 446 F.3d at 551. Thus, Taylor has
established that she engaged in protected activity under the
FMLA and Title VII.

        2. Causal Connection

        a. Awareness

The defendants contend that Taylor cannot establish a
causal connection between her termination and her protected
activity, because "[t]here is no evidence" that those "involved
in the decision were aware" of Taylor's complaints to Lazor and
McDaniel. ECF No. 15-1 at 18. To show a causal connection, a
plaintiff must show the defendant knew of plaintiff's protected
activity. *See Holland v. Washington Homes, Inc.*, 487 F.3d 208,
218 (4th Cir. 2007). Although Williams's role in Taylor's
termination is unclear, McDaniel indisputably played a part in
the decision to terminate Taylor. *See, e.g.*, ECF No. 18-7 at 4.
Because Taylor complained directly to McDaniel about Williams's

alleged discrimination against her on the basis of sex, and about Williams's discrimination against employees approved for FMLA leave, *see* ECF No. 18-2 at 17-20, Taylor has offered sufficient evidence that Rite Aid was aware of her protected activity when she was terminated.[36]

### b. But-For Causation

The defendants also contend that Taylor cannot show that her protected activity was "the 'but-for' reason for her discharge" under *Nassar*, because she does not dispute that she "was not satisfactorily performing her job." ECF No. 21 at 8. *Nassar* requires a plaintiff asserting a retaliation claim to show that her "protected activity was *a* but-for cause of the" employer's adverse action. *Nassar*, 133 S. Ct. at 2534 (emphasis added). *Nassar* does not require that protected activity be the *only* factor that resulted in an adverse action, just that the adverse action would not have occurred without the protected activity. *See Nassar*, 133 S. Ct. at 2533 ("Title VII requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer."). Accordingly, Taylor's performance problems alone, even if they motivated the decision to terminate her in part, do not foreclose a retaliation claim under *Nassar*.

---

[36] Rite Aid does not argue that those who terminated Taylor were unaware that she took FMLA leave. *See, e.g.*, ECF No. 15-1 at 18.

29

Here, although Taylor had been experiencing performance
problems related to associate counseling for at least six months
before she was terminated, her last performance review in early
August indicated "immense[]" improvement in that area. *See* ECF
Nos. 15-2 at 83, 18-8 at 2. She was terminated less than three
weeks after she complained to McDaniel and Lazor about Williams,
and within a matter of weeks after she took her first FMLA leave
under Williams. *See* ECF Nos. 15-2 at 43, 73; 18-2 at 16-20.
This evidence is sufficient for a reasonable jury to infer that
she would not have been terminated if she had not complained
about Williams, or taken FMLA leave, even if she had recent
performance problems. *See Pinkett v. Apex Commc'ns Corp.*,
1:08CV790 (JCC), 2009 WL 1097531, at *6 (E.D. Va. Apr. 21, 2009)
("[A]n intervening period of only six weeks can, by itself, show
a causal link[.]"); *Price,* 380 F.3d at 213. Williams has
established a causal connection between her termination and her
protected activity.

### 3. Pretext

The defendants have produced evidence of a legitimate, non-
discriminatory reason for Taylor's termination--her documented
performance problems in the area of associate counseling. *See*
ECF No. 15-1 at 18; *King v. Rumsfeld*, 328 F.3d 145, 151 (4th
Cir. 2003) (denying retaliation claim, because plaintiff failed
to rebut employer's evidence that he "was not meeting

[defendant's] job performance expectations"). To survive
summary judgment, Taylor must rebut that evidence by showing
that the proffered reason is, more likely than not, a pretext
for discrimination. *See Holland*, 487 F.3d at 214-15 (*quoting
Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 143,
120 S. Ct. 2097, 2106 (2000) (internal quotations omitted)). A
plaintiff can do this "by showing that the employer's proffered
explanation is unworthy of credence." *Id.* (*quoting Texas Dep't
of Cmty. Affairs v. Burdine,* 450 U.S. 248, 256, 101 S. Ct. 1089,
67 L.Ed.2d 207 (1981) (internal quotations omitted)).

Here, there is undisputed evidence that Taylor had serious
performance problems in the area of associate productivity and
attendance counseling, and that she was formally reprimanded for
her deficient performance. *See, e.g.*, ECF No. 15-2 at 83.
However, her last performance review before her termination
indicated "immense[]" improvement in that area and favorable
performance otherwise. *See* ECF No. 18-8 at 2; *E.E.O.C. v. Navy
Fed. Credit Union*, 424 F.3d 397, 408 (4th Cir. 2005) (finding
plaintiff had rebutted evidence that she was terminated for
performance problems, because the evidence showed that she had
improved in the cited problem areas). Further, although
Taylor's reviews were not uniformly positive, she received an
overall rating of "meets expectations" on every performance
review. *See, e.g.*, ECF No. 15-2 at 74-77, 82; *see also Navy*

31

*Fed.*, 424 F.3d at 408 (finding evidence of pretext because the
evidence showed plaintiff's "supervisors were pleased with her
overall job performance"). Finally, Mayweathers testified that
she was always informed when management personnel were
experiencing performance problems, but she was not informed that
Taylor had any performance problems before Taylor was
terminated. *See* ECF No. 18-10 at 17-19. From this evidence, a
reasonable juror could conclude that Taylor's performance
problems were not the actual reason for her termination.

Further, in addition to the short time between her
protected activity and her termination,[37] there is some evidence
in the record that suggests discrimination may have been the
reason for Taylor's termination. *See Jiminez*, 57 F.3d at 378.
Taylor testified that Williams did not want to promote Lockett
because she took FMLA leave,[38] and Mayweathers testified that

---

[37] *See Rhoads v. F.D.I.C.*, 257 F.3d 373, 394 (4th Cir. 2001)
(plaintiff rebutted employer's "legitimate, non-discriminatory"
reasons for her discharge, in part, by offering indirect
evidence of discrimination in the form of "close temporal
proximity" between her protected activity and her discharge).

[38] Even if Williams did not have the authority to terminate
Taylor, he did play a role in the decision by highlighting her
performance problems when he was consulted before she was
terminated. ECF Nos. 15-5 at 6; 15-6; 18-6 at 7. A company may
be liable under Title VII for the actions of an employee who
lacks the authority to make a final employment decision, if the
decision-makers "merely rubber-stamped" the decision of the
employee who lacked formal authority. *See Russell v. BSN Med.,
Inc.*, 721 F. Supp. 2d 465, 479 (W.D.N.C. 2010).

McDaniel believed that some employees abused FMLA.  ECF Nos. 18-2 at 13, 18-10 at 10-11.  After Taylor requested a transfer from Williams, McDaniel asked her if she had ever been supervised by a man before.  ECF No. 18-2 at 19.  This evidence is sufficient to create a triable issue of fact that discrimination against Taylor for complaining about Williams and taking FMLA leave was the real reason for her termination, rather than her performance problems.[39]  Rite Aid's motion for summary judgment on Taylor's retaliation claims will be denied.

III. Conclusion

For the reasons stated above, the defendants' motion for summary judgment will be granted in part and denied in part.

1/24/14
Date

William D. Quarles, Jr.
United States District Judge

---

[39] The defendants fault Taylor for relying on the EEOC's written report to support her claims, because they assert that the evidence in the report is inadmissible at trial.  *See* ECF No. 21 at 2.  The Court need not decide now if the EEOC's report would be admissible, because the Court does not rely on it in denying summary judgment on Taylor's retaliation claims.